Thank you, Your Honor. My name is Tom Tao, and I represent the Jim Leachman Parties. Not to be confused, by the way, with the company which is also called Leachman, Leachman Cattle Company, that he did start and organize and got going and eventually was taken over by his son and one of the members of the defendants. He is not a party and not that party, something that the district court got confused on. And I think that caused a great deal of problems. I want to start out this morning, if I may, with the second argument that I make, because I believe that's the most egregious one. I believe that's where the most serious error exists, and I believe that's the one that has the most inequitable result. This is the marshalling of assets. The marshalling of assets is a common law equitable doctrine that was codified in the state of Montana. If a common debtor, that's where there's a common source of funds or funds in the hands of a common debtor, then if it's equitable and it will not cause injustice to other persons, you can marshal the assets. If you have a lien on more than one property, the court can determine which would be most equitable to sell first, so that the junior lien holders would have a better opportunity to receive their funds. But there are two problems here. In this case, the company, Leachman Cattle Company, borrowed money from the Farmers Home Administration, now FSA, Farmers Service Administration. And in doing so, and cutting through all kinds of facts, but just the critical things, the officers, which is not uncommon, were asked to sign, to co-sign the note. Okay, fine. And they were also asked to pledge their home, was not a part of the company, and another ranch, the Hairpin property, that was not owned by the company. But counsel, whether it was owned or not, the fact remains that those items were pledged as security for the loans, right? No question about it. No question about it. They were, and they signed the notes as a debtor and not as a guarantor. That's true. But the equity part is that it was not their debt. There was not a piercing of the corporate veil here. They were not a part of the debt. And it's their property that is being taken. And that's the injustice. So what does it mean to say that they were signed as debtors? Oh, there's two ways. When a bank asks you to sign, to co-sign a note, you either co-sign where your name comes right below the principal debtor, or you sign a guarantee agreement. I hereby guarantee that the debtor will pay the debt. Are they personally obligating themselves to pay for the debt? Both. It has essentially the same result. And yes, they signed as a co-signer right under the principal debtor. They were obligating themselves in their personal capacity. Oh, yes. No question about it. There's no issue. No issue there. There's no question but what the hairpin property, which is the key item here, the hairpin property definitely is pledged to the FSA debt. No issue there. The question is, and that's the critical one, do you have to take the hairpin property, which doesn't belong to the company, to pay the company's other debts? And in this case, Asheville. Asheville has a second mortgage on the company's home place. But they don't have a mortgage on the hairpin. And because they don't have a mortgage on the hairpin, that shouldn't go to them. And that's the injustice. Because the court, the lower court here, said sell the hairpin first. All the money is going to go to pay FSA. And that leaves almost all of the money in the home place, the company's only property, to go to Asheville. Now, the other way around, which is the proper way, would be that it would be, it would, you would sell the company's property first. The company is the debtor. The company is the one who encouraged, who got the money and used the money and needs to pay it back. Sell that property first. And if there's any deficiency, then take it out of the hairpin property. Counsel, is that consistent with the law in Montana regarding marshalling assets? Yes. It is because for two things. They have, the judge, I think, improperly applied the marshalling of assets statute of Montana. And I think he did so for two wrong reasons, two things. First, there is a common debtor. In order to apply that law, you have to have a common debtor, a common source of funds, if you will. Funds under the same debtor. That doesn't exist. The common debtor, the only debtor here is the company. Asheville does not have any claim on the officers, in this case my client, the Jim Leachman parties. They don't have, they, the Jim Leachman parties don't owe Asheville anything. Not a common debt. It's not a common source. The two sources. What portion of the Montana, what Montana statute provides that there must be a common debtor? What language are you relying on to support your argument that there has to be a common debtor under Montana law for assets to be marshalled? Very good question, Your Honor. It is not specifically stated in that statute. However, that statute is a codification of the common law. And every case that you read on that point on on the whole common law notion of of marshalling of assets and equitable doctrine states very clearly. It has to have a common source. And and I can cite you to the to the cases that I have cited in page 44 of my original brief. Isn't the problem in this case, though, is no matter which way the judge does it, somebody loses out. Oh, I agree. I agree. Who loses and who should lose. I agree again. I don't think there's any question. But but the point is the equities and that brings us to the equity portion. The equities are this. Do you hold this? Do you hold the officer who was once the officer of the company then resigned because the company officer at the time the debt was incurred? Correct. No question about it. But then then the debt was renewed and renewed and renewed. And he eventually left the company and left it over in charge of his son, who was at that point aligned with Asheville Farms. OK. It's unfair to take the officer's personal property to pay the debts of Asheville Farms, who doesn't have a mortgage on that hairpin property. If if they had a mortgage on that, which the court originally thought, as you can see from the record, but was wrong, that would be different. But they don't have a mortgage. They don't have any claim to the hairpin property. The only way they're getting paid out of the hairpin property is because of by judicial fiat. We are taking and making a mortgage to these folks on the hairpin property, which doesn't exist. That's unfair. It's unfair to. Unfair to Corrine, who incidentally is now divorced from Jim Leachman and her whole her whole settlement, her whole property settlement is tied up in that. She has a mortgage on the hairpin property. She has a first mortgage or a first mortgage because the FSA has a first mortgage. She has a high mortgage on the hairpin property. If it all goes to pay the company debts, she gets nothing. Well, that isn't quite true. There are some judgment debtors that will benefit, and she is one of those. But that's way down the line, very small amount. And then there are still some other parties. There are some parties that aren't related in any way that have a mortgage on the hairpin property. But by judicial fiat, we are putting a – giving them a first mortgage on the hairpin property, and they lose altogether, totally. If the district court's order is implemented, the hairpin property gets held first, will that fully satisfy FSA? The hairpin property without the interest will probably fully satisfy the FSA. FSA. Don't know how much it will sell for, but – Is there any – has there been any – There will be a little left over. A little left over. And that will go – where will that then go? Well, under the court's order, hairpin property sold first. Any deficiency, then, would go on the home place. The home place would next be sold. They first pay the deficiencies. Assume that there's some balance left. And the balance – After paying off FSA fully. So first – according to the court's order, first party – first proceeds go about a million dollars, $883,000 plus interest plus attorney's fees. About a million dollars will go to Asheville Farms. And then if there – And then it will go to the judgment debtors of the company. So wait. So if – after selling hairpin property, the ranch, the money left over after satisfying FSA, that will go to the group over here. Correct. Asheville. And if there isn't enough – probably enough, but there probably won't be – satisfied, then they sell the home property. Correct. That's the idea. I'm running out of time. What happens if there's anything left after selling the home property? It goes to the judgment creditors. Under the district court's case ruling, it goes to the judgment creditors of the company. And the officers who pledged their property as support for this loan receive nothing. And the creditors of the officers receive nothing. Go ahead. Another point you wanted to make? I really do. The mortgage is invalid. I'm going to say this very quickly. I want to save some time for release – for rebuttal. The mortgage is invalid. Their mortgage. Their mortgage. Because it doesn't state the amount on its face. I think that the statutes – if you look at the statutes, it's very clear. 71-1203 says it must be in writing. 204 says the form may be substantially as follows. And it says blank dollars. And the next statute, 206, says the total indebtedness must be in writing. It is not. We don't even know what notes are here because the mortgage says the notes of even date. There are no notes of even date. The mortgage was August 1 of 2001. One note is October 1 of 2001, another October 31 of 2001, another note of August 30 of 2001. Don't you have actual knowledge of the mortgages anyway, constructed actual either way? Do we have knowledge? The question – we have knowledge that we think that there is money that probably was lent. We don't know which notes were and which ones were secured. And that's the key. The problem is, is there a possibility that the mortgage eventually was taken out without security and security came in later, as I think they're claiming. Then there's a preference kind of situation. We don't know what notes were supposed to be tied to that mortgage. We don't know. And that's a factual question. Some of the judgment was not appropriate here. And furthermore, it's invalid for another reason because it was never approved by a supermajority, which the operating document of this company says is required, 70 percent. Is that what your client now claims he now remembers or doesn't remember it being approved? It was not – he said, and I probably wrote that incorrect. He said, I have no recollection of this ever happening. And they're saying, oh, you don't know for sure. There is nothing in the record. We have all the minutes. There's nothing there. They have never been able to point to anything that ever shows this was ever approved. It was not. The only thing they can say is, oh, there was a motion saying we invite members to make a loan under these circumstances. That was approved. The specific loan was never approved. The specific mortgage on specific property was never approved. And then there was an equity question. I'm going to waive that. I mean, I'm going to not waive it, but I'm going to not discuss it. I want to save some time. Okay, thank you. Good morning, Your Honors. My name is Kyle Gray, and I am here representing the Asheville Parties. Let me apologize first. I'm having a cold, and so if you're having problems hearing me or if I sneeze, please forgive me. Let me start out with what Mr. Tao ended with, and that's the issue of is this a valid mortgage. We really think there's no question there. Montana law is clear. You may put the amount on the face of the mortgage, but you do not have to. What do you do with the statute that says you must show? How do you read that? The statute, the one that has the what Mr. Tao calls the total injunctive or. It's very specific. Future advances, isn't that? It is very specific. It's very specific that it applies to future damage or, excuse me, to advanced. It's a descriptive or, Your Honor. It's as if, let me give a quick example. If you had a statute that says you can have Christmas or the 4th of July off, that's a conjunctive or. You pick one or you pick the other. Now, if you have a statute that says you can have Christmas or December 25th off, that's a descriptive or, and that's what's in here. So it wouldn't matter if you took out Christmas because December 25th is Christmas, or if you took out December 25th because Christmas is Christmas. And here, the language of the statute uses that kind of or. It says, excuse me, the amount of future advances or total indebtedness that may be outstanding at any given time. Total indebtedness that may be outstanding at any given time is the same as a future advance. They're the same thing. And it's getting at the same concept. You see it in the title of the statute, future advances, which Montana law says should be given some weight. If the body of the language is totally contrary to it, then you ignore the title. But if it's not, then the title actually helps construe the statute. So either what we have here is with the title of the statute, we have an unambiguous statute as Judge Siebel determined, or the other possibility is you have an ambiguous one, and then you go to the. When the legislature was, let's just talk about future advances. What was the legislature trying to protect? What they were trying to protect there is kind of the exact opposite of what we have here, where you have, say, an amount on the face of the mortgage, and it says $100,000. Someone comes in, looks as that's recorded, and sees $100,000. So this property is, I think, worth more than that, so I can safely lend on it. Well, that's not a safe assumption if there's going to be future advances. So it turns out that $100,000 on the face really is $200,000 or a million or whatever. So that's what the legislature was protecting against, that specific occurrence. Now, when you have a mortgage that is not subject to future advances, and there's no question here that this one was. In other words, if you had a situation where the indebtedness was for money to be paid out over time, the mortgage has to include those amounts? Right. That's what that statute says. Then on year one, you get $50,000. On year three, you get $100,000. If there's going to be future advances. It has to be in the mortgage. That has to be in the mortgage. Or you have one that doesn't have anything on it at all. Over time, whatever that total amount is, the total and possible indebtedness has to be in the mortgage. Right. Yes, that's correct. And that's simply not our situation here. What we have is a mortgage. Why wouldn't somebody – why doesn't the legislature also want, for purposes of notice, that the amount be included in the – any total amount be included in the mortgage? I don't understand. Well, I won't attempt to speak for our legislature. It can be a grand mystery to everyone. But the reality is they did not. If you're asking what the policy would be, it's pretty simple. If there's nothing on the mortgage except it's recorded, you go in, you get your constructive notice that there is a mortgage, then it's up to the person who's thinking about lending money to satisfy themselves as to what the amount is, whether there's enough equity left in the property so that they can make a safe loan. It's easy. If they can't satisfy themselves on that, then they don't make the loan. So the inquiry notice is there, and it is very protective. It's putting the onus on the person who's thinking about lending some money to go figure out the facts. And if they can't, then they don't lend the money. That's protective in and of itself. The other statute, the one for future advances, is, in fact, the flip side, which is if you go in and you see an amount, you should be able to rely on it. And that was what was happening in Montana when the future advances statute was passed. Those kind of things were what the legislature was protecting against, that someone would come in, have a number on the face of the document, and then you would rely on it, make a loan, and it would turn out, no, there are future advances, so your secondary position is no longer worth much, if anything. So if you took a mortgage, so if you looked in the quarter's office and you saw an amount and it later turns out that there were future advances not disclosed on the mortgage, is the mortgage invalid? I think it would probably be invalid in the sense of the person who came in later and loaned money on it thinking it was $100,000 and it turned out to be $500,000. That person would not be held to it. I think it would clearly be still valid under the Amsterdam and Kraft cases as an equitable mortgage between the parties. So in this case, between the LLC and the Asheville parties. But it would not be one that you could have your lien go forward on the future advances. Although, again, I'm speculating. So here, as long as they didn't put an amount in the mortgage, everybody's just on notice? Everybody's on notice. Everyone's on what the court calls inquiry notice. And that's pretty straightforward. So it leaves parties free. I mean, we're not talking about instruments that were drafted by lawyers here. These were drafted by parties. And, you know, you cannot expect the same clarity, I guess, from ones that are drafted by laypeople. And so leaving it so that it's the inquiry notice that matters when there's nothing misleading to the contrary. And that's what the future advances was worried the statute was worried about. It can be misleading if there's a number and then there are future advances. Counsel, what's your response to opposing counsel's representation that the loans were never approved by the required super majority of votes? We just totally disagree with that, Your Honor. I'm glad you brought it up. The issue is whether or not a material issue of fact was raised or remains regarding that issue. Right. And it does not. I was surprised when we received Mr. Tao's brief, his reply brief, when he said we did not address that issue. In the brief, actually, it's on pages 32, 33, and 34 of our brief. And the response is in the second, how could declarate. Well, what happened first is, as I think Judge Collins pointed out, Mr. Leachman, and this is James Leachman, so we don't have any confusion here, is that in his first declaration, I don't recall, I don't recall. Well, and there's we cited a Ninth Circuit case in our brief, the FEC versus Toledano, where this court said failure to remember and lack of knowledge are not sufficient to create a genuine dispute. But it should be fairly simple to resolve this point if there are minutes of the company that reflect who voted for and who voted against. And there are, Your Honor. They're attached to the second HOUC declaration. And it shows who voted for whom or for what. It's supplemental excerpt of the record at 058. And this whole compilation of the minutes, the memo from Mr. Lee Leachman, talking about how they're going to give liens on cattle and land to these members of the LLC who put the money in,  and then on that page, SCR 058, it says motion, use the following as guidelines for option on borrowing money from members. And you go through that and you read where you get. And it's got the amount of people who voted on it. Bill, yes. Dick, yes. Federico, yes. Jorge, yes. Lee, yes. Jim, yes. Roger, yes. That was everybody? That was 77%, Your Honor. Matt has not always been my strong suit, but that's everyone but the two folks, one of whom left and one of whom was not there. Seven out of ten. Or seven out of nine, excuse me. You're right. Matt's not your strong suit. Yeah. Sure, Your Honor. So that's ‑‑ it's there. And the interesting thing about that is, so after Mr. Leachman said no recollection, Mr. Howe comes in and says, I not only have the recollection, and he says there was, you know, the intent was of the company to have mortgages for these loans from its members, he produced these notes as well. Then what we get, interestingly enough, after that is a second declaration from Mr. James Leachman. And in that one, he says, excuse me as I flip through this rather voluminous record here, that starts on page 513 of volume 2 of the record. And he says in paragraph 3 there, although I was present at a board meeting when stockholder loans were proposed and guidelines were adopted, I was not aware of the details of the transaction regarding to the actual parties. I do not know the specific amounts of the loan. I do not know what security was pledged as collateral for these loans. I do ‑‑ did not know the dates of either the notes or the mortgage. So he's either saying, I don't know anything, or he's saying he knew there was a mortgage. I'll leave it to Your Honors to decide which one that is. But it really doesn't matter because, again, as I said in the Tolanado case from the Ninth Circuit, failure to remember and lack of knowledge are not sufficient to create a genuine dispute. So we simply don't have a genuine dispute on that issue. So I'll go ahead and go to marshalling then, which is where, unless Your Honors has some other questions on the marshalling. I want to get to marshalling. Okay. We'll go to marshalling. Well, I'd like to answer Judge Rawlinson's question first, which is what is the Montana law on that? And that's a very good question. Get to the marshalling statute here. Montana law as a general rule does not incorporate the common law. Montana law is statutory. If there's no statutes, then you can look at the common law, and whether or not our court will go along with it is generally anybody's guess. But here we have a statute. And so we're bound by the statutory rules that we cited in our brief where the Montana Supreme Court requires statutory interpretation be done by neither adding something that is not there or admitting something that is there. And so looking at these statutes, particularly 71.3.115, it says this, where one, that would be the United States, has a lien upon several things, and that would be the home place, the hairpin, and the residence. And other persons, that would be the actual parties, have subordinate liens upon or interest in some, the LLC property, but not all of the same things. The person having the prior lien, if he can do so without risk of loss to himself, and the USA has said there's no risk to them, however you do it, or of injustice to other persons must resort to the property in the following order. You go through exclusive lien. The USA does not have an exclusive lien on anything. Second, to the things which are subject to the fewest subordinate liens. And it is indisputed that the hairpin ranch is subject to the fewest subordinate liens. So under the marshaling statutes, which say must, that must be sold first. Second, the residence should be sold because that, too, has fewer liens than the home place, which has many, many liens on it. Judge Stiebel, though, took from these statutes that he had the discretion to balance equities. And I think he was correct in determining that. It's as one of the counsel who was here earlier said, well, we keep having to go back to the standard of review. Here I think on this issue, on marshaling, the standard of review is abuse of discretion because balancing equities is generally, it is a job for the court. And Judge Stiebel went through and looked at things, and he actually went a little differently than the statutory requirement. He admitted if he did it the way the statute says, he'd have to go hairpin, residence, home place. Instead, he went hairpin, home place, residence. Thereby leaving Mr. Leachman his home. But he could do that when it talks about injustice. Yes. And we did not appeal from that, Your Honor. We stayed with how Judge Stiebel balanced the equities. And so what you've got is a situation there where he was looking at everything and made this determination that he was going to be fair to Mr. Leachman or reach beyond the statute to help out Mr. Leachman. And still he didn't want to leave other parties without anything. But I think as Judge Collins pointed out, there's never a situation in these types of cases where everyone's going to be happy. I mean, you foreclose because there's not enough equity. And so there's going to be a fight among lien holders. And what I would like to point out is something that Mr. Tao has never said in any of his briefs, which is it's not unfair in any event to do the hairpin, the home place, and then the residence is left. The people he talks about as third parties, that would be Caroline Kersher, Corrine Leachman, and the Tao Law Firm all have mortgages on the residence. They can go after the residence if they choose so. So that has left the parties, and yet my clients, the Ashevilles, have no mortgage on either the residence or on the hairpin. So if Judge Siebel were to be overturned on that discretion of saying who it's fairer, how it's fairer to do this, that would leave my clients who lent money to the company and all that, it would leave them without any potential recovery. And that was what Judge Siebel determined was totally unfair. Thank you, Your Honor. Thank you. I believe you had a minute or so for rebuttal. Get out of your way here. Rebuttal. Let me start out by talking about the future advances. Interestingly enough, I was in the legislature when that amendment was passed. Ray Labick is a good friend of mine. She misses the whole point. The whole point is everybody in the legislature contemplated that the mortgage has to say the face on its face, the total indebtedness, and the future advances must also or at least have a formula for determining that. There's a reason for that. So that you can tell how much is outstanding if you want to make another loan. That's the purpose for the statute. That's what was done. Everybody contemplated that when the Montana legislature did that. It would have been extremely helpful if they had just said that a mortgage must contain the amount of the mortgage on the face of the mortgage, if that was everybody's intent. It would have been really clear if that had been done. I agree. I agree. But it does say may be in the following form, quote, blank dollars, close quote. I don't know how you can get a whole lot clearer than that. Anyway, you're right. How about shall? It could have been shall. Must. It could have been. No question about it. And it is not. We have to deal with what we've got. And I think it's clear that the legislature contemplated that's what was required, that it had to be there on the approval of the loans. There is no specific approval. My goodness. It says that use the following as a guideline for options on borrowing money from members. And it goes on to, you know, nine percent interest, 13 months minimum or longer if possible. There's nothing specific about a specific loan. And that's required as a statute. Right.  I think, Your Honor. I agree that the statute could be clear. We have to deal with that. That's clear. So. Oh, and. OK. And I just I do want to say one more thing. As far as the lien on the residence is concerned, that's that's not true. We don't have a lien on the residence. But but it doesn't really matter. The point is when when it was a codification of the common law, you have to look at the common law to determine how to interpret the statute. And when you do that, I think it's clear you have to have a common source. And furthermore, it's an injustice to others. That's the key. OK. Justice to others. Thank you, Your Honor. Thank you, counsel, very much. We appreciate your arguments in the matter. We'll be. Thank you. Thank you. Let's see. That takes us to Boise Tower associates versus Washington Capital Joint Master Trust. Thank you.
judges: Paez, Rawlinson, Collins